**ATLANTA JOURNAL AND CONSTITUTION, et al., Plaintiffs,**

v.

**The CITY OF ATLANTA DEPARTMENT OF AVIATION, et al., Defendants.**

**USA Today, a division of Gannett Satellite Information Network ("GANSAT"), Inc., et al., Plaintiff,**

v.

**The City of Atlanta Department of Aviation, et al., Defendants.**

**Nos. CIV.A.1:96–CV1738RWS, 1:96–CV–1847RWS.**

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 2, 2004.

**1312**

Peter Crane Canfield, Sean R. Smith, Thomas MacIver Clyde, Dow Lohnes & Albertson, James Clifton Rawls, Powell Goldstein LLP, Atlanta, GA, for Plaintiffs.

Ashley B. Watson, Seyfarth Shaw, Evelyn Yvette Teague, Michael Lloyd Smith, Clifford E. Hardwick, IV, Office of Atlanta City Attorney Law Department, Michael W. Tyler, R. Scott Tewes, William Henry Boice, Kilpatrick Stockton, Atlanta, GA, for Defendants.

### ORDER

STORY, District Judge.

This case is now before the Court for consideration of Defendants' entitlement to restitution for back rent and Plaintiffs' attorney fee petitions including: The Atlanta Journal and Constitution's Motion for Attorneys' Fees and Expenses [173–1, 141–1], New York Times Company's Motion for Attorneys' Fees and Expenses [174–1, 140–1], USA Today's Second Motion for Attorney's Fees and Expenses as Prevailing Party [177–1, 144–1], and USA Today's Second Application for Attorney's Fees and Expenses [178–1, 145–1]. After considering the entire record and the arguments of the parties, the Court enters the following Order. Since the facts of this case have been set forth in numerous published opinions and previous Orders of the Court, they will not be repeated here ex-

cept as they are required for the following discussion.

## I. Restitution

Plaintiffs the Atlanta Journal Constitution ("AJC") and USA Today filed separate suits in 1996 seeking injunctive relief against the City of Atlanta, Georgia, (the "City") Department of Aviation (the "Department") as a result of the implementation of a plan to regulate the distribution of newspapers through newsracks at Hartsfield–Jackson Atlanta International Airport.[1] On July 11, 1996, the Court entered an Order granting Plaintiffs injunctive relief which enjoined the City from enforcing its 1996 newsrack leasing program (the "1996 Plan"). In July 2000 the Court issued a permanent injunction against the City's newsrack plan. *See Atlanta–Journal & Const. v. City of Atlanta Dep't of Aviation,* 107 F.Supp.2d 1375, 1384 (N.D.Ga.2000) (hereinafter *"AJC I"*). The injunction was comprised of three parts and required that: (1) the Department must not adopt a newsrack plan which forces publishers to use newsracks bearing advertisements for other products; (2) the Department must not adopt a newsrack plan which requires publishers to pay a fee which is not tied to the Department's costs in administering the newsrack plan; and (3) the Department must not adopt a newsrack plan that vests unbridled discretion in the person or persons responsible for selecting publications or determining who may continue to place publications in newsracks. *Id.* A panel of the Eleventh Circuit Court of Appeals initially affirmed the decision. *Atlanta–Journal & Const. v. City of Atlanta Dep't of Aviation,* 277 F.3d 1322, 1329 (11th Cir.2002) (hereinafter *"AJC II"*). Subse-quently, the Eleventh Circuit, sitting *en banc,* affirmed parts (1) and (3) of the injunction but reversed as to part (2) on the newsrack rent, and remanded the case for further action consistent with that opinion. *See Atlanta–Journal & Const. v. City of Atlanta Dep't of Aviation,* 322 F.3d 1298 (11th Cir.2003) (en banc) (hereinafter *"AJC III"*). In that opinion, the Eleventh Circuit stated that "[u]pon remand, the district court should not be precluded from considering the City's claim, if any, for lost revenues from enjoined fees that we have determined were constitutionally permissible." *Id.* at 1312. By an Order entered May 27, 2004 (the "May 27 Order") the Court denied Defendants' motion to amend to assert a counterclaim but held that Defendants' claim for back rent was more properly considered by the Court as an equitable claim for restitution. Pursuant to that Order, the Court held an evidentiary hearing on the issue of restitution. The parties have now submitted proposed findings of fact and conclusions of law and objections thereto on the propriety and amount of restitution. The Court considers these two questions in turn: (1) whether the City is entitled to restitution, and (2) if so, what amount of restitution the City is entitled to recover.

### A. Entitlement to Restitution

As is consistent with the history of this litigation, the parties find themselves once again at opposite ends of the spectrum. Although Plaintiffs the AJC and New York Times contend that they never opposed the payment of a reasonable fee for placement of their newsracks at the airport and though they have received revenue generated from the newsracks at the airport during the period of the injunction, they

---

**1.** These suits were consolidated in November 1996. The Court permitted Plaintiff the New York Times to intervene in May 1997.

now contend that equity dictates that they should not be required to pay any amount to the City.[2] Furthermore, although the City never withdrew the 1996 Plan that was the impetus for this lawsuit and defended it through eight years of litigation, the City now claims that it is entitled to all fees it would have received not only under that plan, but also under subsequent plans that were never adopted.[3] Plaintiff USA Today does not contest the City's claim for restitution altogether but asserts that the $20 per newsrack fee that the 1996 Plan imposed is the maximum that should be permitted, with additional reductions based on other factors.[4] The Court finds that the City is entitled to restitution but that the equities of the case support an award at neither extreme.

■ As the Court noted in the May 27 Order, in *Arkadelphia Milling Co. v. St. Louis S.W. R. Co.*, 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517 (1919), the Supreme Court recognized an equitable right for a party to be restored to what it had lost upon a judgment of reversal. *Id.* The Court has the inherent equitable power to correct that which has been wrongfully done by virtue of its process. *Id.* Restitution is not a right but rests in the sound discretion of the court. *Atlantic Coast Line R. Co. v. Florida*, 295 U.S. 301, 310, 55 S.Ct. 713, 79 L.Ed. 1451 (1935).

■ Plaintiffs AJC and New York Times assert several arguments as to why the City should not be granted restitution. First, Plaintiffs contend that the payment of back rent would be discriminatory and retaliatory toward the Plaintiff publishers because the City has not pursued the payment of back rent from other publishers that maintained newsracks at the airport during the injunction. The City responds that even though it has not yet sought payment of back rent from non-party publishers, it fully intends to seek back rent from them when the lawsuit is resolved. (*See* July 19, 2004 Hr'g Tr. at 87–88.) The City states that it is interested in minimizing additional litigation by awaiting the Court's decision on the reasonableness of the fee before requesting payment from others. The Court finds that it is not unreasonable for the City to await the Court's ruling on back rent before seeking to collect from non-parties. Though the AJC and New York Times suggest that the City's statements are disingenuous, the City has represented to the Court that it will seek back rent. More importantly, there is nothing before the Court to suggest that by waiting to do so the City is acting in a discriminatory or retaliatory manner toward Plaintiffs.

Second, the AJC and New York Times contend that the amounts requested by the

2. The AJC and New York Times contend that the City is not entitled to restitution. If, however, the Court awards restitution, they argue that the maximum amount should be eleven percent of the gross revenues from the newsrack sales. For the AJC this would amount to $105,511.00. For the New York Times it would amount to $3,293.00.

3. The City seeks restitution based on the following rates: $20.00 per newsrack per month from July 1, 1996 to July 31, 1996 plus interest; $27.00 per newsrack per month from August 1, 1997 to September 30, 2003 plus interest; and $30.00 per newsrack per month from October 1, 2003 plus interest. Based on

this formula, the City asserts a claim for restitution against: AJC in the amount of $359,532.00; New York Times in the amount of $39,902.76; and USA Today in the amount of $153,786.33.

4. USA Today contends that the maximum restitution the City should be allowed should be calculated at $20 per newsrack per month at seven percent annual simple prejudgment interest. Therefore the maximum total amount due to the City would be $117,703.62. With the reduction for the "other factors" USA Today contends should be considered, the amount would be reduced to $45,988.80.

City are disproportionate to the fees the airport customarily charges others for use of airport space and are therefore "unusual, unreasonable, and arbitrary." They assert that the usual charge for sale of newspapers and publications is eleven percent of gross revenue, but that the amount of restitution requested by the City would amount to a far greater percentage of revenue.[5] The City responds that many vendors at the airport actually pay a far greater percentage of gross revenue than the eleven percent cited by Plaintiffs based on leases which require payment of a minimum annual guarantee. (July 19, 2004 Hr'g Tr. at 56.) The City also contends that a calculation based on gross revenue rewards Plaintiffs for flooding the airport with newsracks that sell little, if any, newspapers. On this point, the Court agrees with the City.

Although a potential factor in determining the reasonableness of the fee, nothing requires the City to calculate the newsrack rental fee in the same manner in which is calculates other rental fees in the airport. *But see AJC III,* 322 F.3d at 1313 (Anderson, J. concurring) (noting that using the same formula to calculate rental rates for newsracks would virtually foreclose a First Amendment challenge). During the course of the litigation, Plaintiffs were able to maintain revenue generating newsracks at the airport without consideration as to the cost of maintaining those newsracks. In other words, the publishers had no incentive to remove newsracks that sold only a few papers per day because the publisher did not have to factor rental cost into the profitability of the newsrack. Therefore, Plaintiffs' calculation based on gross revenue improperly rewards Plaintiffs for maintaining unprofitable news-

racks, which occupied valuable commercial space in the airport. Therefore, the Court finds that imposing a fee that amounts to greater than eleven percent gross revenue is not unreasonable *per se,* and declines to adopt Plaintiffs' suggestion to cap restitution at that amount.

Finally, AJC and New York Times contend that the City's refusal to propose or negotiate reasonable rates during the course of this litigation weighs against the award of back rent. The Court is well aware of the duration of this litigation. In considering the propriety of restitution for back rent, however, the Court finds another factor of much greater importance. The simple fact is that the Plaintiff publishers maintained newsracks at the airport in commercially valuable space for years without paying for it. Plaintiffs have maintained that they never opposed the payment of a reasonable fee for having their newsracks at the airport. In fact, prior to the imposition of the 1996 Plan Plaintiffs paid for newsrack space at the airport. Nothing in the record suggests that the City ever planned to offer free newsrack space at the airport or that Plaintiffs ever expected a "free ride." *See AJC III,* 322 F.3d at 1309 (stating that the "[h]istory of regulation can be a guarantor that current regulations are constitutionally reasonable."). In July 1996, these Plaintiffs obtained an injunction which prevented Defendants from implementing a plan that required publishers to pay a fee not tied to the costs of administering the newsrack plan. In February 2003, the Eleventh Circuit Court of Appeals vacated that portion of the injunction and held that the Department could impose a profit-conscious fee for the use of newsracks at the Airport. Parts of the injunction that

---

**5.** Plaintiffs state that the City's restitution request amounts to 34.5% of gross revenue received during the period of the injunction from AJC; 139% from New York Times; and 53% from USA Today.

Plaintiffs sought is still in place, but it is evident that the prohibition against imposition of a profit-conscious fee has been vacated by the Eleventh Circuit Court of Appeals, and the City is entitled to recover payment for the rent it was prevented from collecting by the imposition of the injunction. The City is entitled to restitution for back rent.

### B. Amount of Restitution

Having determined that the City is entitled to restitution, the Court now turns to the question of the amount. The City asserts that the Court should be guided only by the constitutional limitations based on what the City could have charged for rent. Specifically, the City contends that as long as the fee they request is reasonable and is not "arbitrary, capricious or invidious," they should be able to recover it fully, plus interest. By contrast, AJC and New York Times assert that the maximum the City should be permitted to recover is eleven percent of the publishers' gross revenue from newsrack sales, with additional reductions. USA Today contends that the maximum the City should be permitted to recover is the amount of the fee it was actually enjoined from collecting, $20 per newsrack per month, plus interest. USA Today also asserts that the

maximum amount should be further reduced based on the equities.

■ The Court has carefully considered each of the parties' arguments. The appropriate amount for the City to recover is the amount that it was enjoined from collecting based on the injunction, plus interest. *See Arkadelphia*, 249 U.S. at 145, 39 S.Ct. 237 (a party against whom an erroneous judgment has been carried into effect, in the event of a reversal has the right to be restored by his adversary to that which he has lost thereby). The 1996 Plan imposed a $20 per newsrack per month fee. A further reduction is warranted because under the enjoined 1996 Plan, a portion of the monthly fee was designated for "cost recovery" based on the publishers' use of City-owned newsracks. (*See* Pl. USA Today's Proposed Findings of Fact and Conclusions of Law on the Issue of Back Rent Ex. C Baker Dep. at 220–23, Ex. 12 thereto.) By contrast, the publishers supplied their own newsracks and the Court finds that Defendants are not entitled to recover the "cost-recovery" portion of the fee. The Court has therefore deducted the $5 portion of the fee that accounted for cost recovery.[6] Finally, the Court has also determined that the City is entitled to prejudgment interest on the back rent in the amount of seven percent per annum. *Arkadelphia*, 249 U.S. at 147, 39 S.Ct. 237.[7]

---

**6.** The City asserts that it would have permitted the publishers to use their own newsracks, but that it would have still charged the $20 per newsrack per month fee. However, the City has not pointed to any evidence in the record to support the position that it would have allowed publishers to provide their own newsracks. The only evidence the Court was able to glean out of the voluminous record suggests merely that the City would agree to permit the publishers to use their own racks for a few months during the Olympics but they would be required to return to the City's newsracks after this time expired. (*See* Mem. in Supp. of Def.'s Mot. for Summ. J. Ex. A. Baker Aff., Ex. 3 thereto.) Therefore, it appears that the City mandated use of its own

newsracks, and included in the fee an identifiable portion to pay for the newsrack itself. Since the publishers did not receive the benefit of the City's newsracks, it would not be appropriate for the publishers to pay that portion of the fee. Moreover, although the City states that it never intended to charge less than $20 per newsrack, the cost breakdown makes it evident that the City expected to recover $15 per newsrack to cover all costs and profits above the cost of the rack itself. The Court's restitution award fulfills that expectation.

**7.** The parties have used seven percent in calculating the interest award. Since it does not

The Court's determination as to the proper amount of restitution is supported by several factors. First of all, the Court has declined to award the City the entire fee which it has requested which included the initial $20 per newsrack per month fee with an increase to $27 in 1997 and another increase to $30 in 2003. Primarily, the Court finds that there is a distinction between what the City *could have constitutionally charged* for rent and what the City was *actually enjoined from collecting* by virtue of the injunction. *See AJC III,* 322 F.3d at 1312 ("the City should be made whole for the *fees it was enjoined from collecting*") (Tjoflat, J. concurring) (emphasis added). It is appropriate in this circumstance to award the City restitution solely for the latter. *See Arkadelphia,* 249 U.S. at 145, 39 S.Ct. 237. Although the City contends that the Court prevented it from implementing a proposed newsrack plan in 1997, that is not the case. In the Court's Order of June 3, 1998, the Court declined to consider a new plan in determining whether the injunction as to the 1996 Plan should be dissolved. The Court held that the 1997 Plan was not ripe for review. Though the City put forward the 1997 Plan, the City never withdrew the 1996 Plan nor withdrew from its position that the 1996 Plan was constitutional.[8] Therefore, the Court held that the Defendants' "conduct subsequent to the entry of the Court's original order suggests that dissolution would be adverse to the public's interest in the preservation of free speech." *Atlanta Journal & Const. v. The City of Atlanta Dep't of Aviation,* 6 F.Supp.2d 1359, 1366 (N.D.Ga.1998) (hereinafter "*AJC IV*"). Therefore, the Court never prevented the City from collecting fees, or implementing a plan that complied with the terms of the injunction, but simply declined to give an advisory opinion on the 1997 Plan because it was never properly before the Court. *Id.*

Moreover, the Court finds that it is inappropriate to impose a retroactive increase in fees upon the publishers. If the City had adopted a plan that complied with the injunction, then at that point the publishers could have made the decision whether they desired to have newsracks at the airport under the terms of that plan, how many, and at which locations. Applying retroactive rental fee increases fails to account for the fact that a change in the policy or fee implemented may have drastically altered the number of newsracks at the airport or even the publisher's decision to have them at all. Since the City never adopted or implemented such a plan, the City was never enjoined from collecting fees under it.

Second, Plaintiffs AJC and New York Times have levied several arguments challenging the fees asserted by the City as arbitrary, discriminatory and retaliatory. For instance, Plaintiffs contend that the fees are not comparable to those charged other vendors at the airport and that billing irregularities have prevented the City from collecting fees in some instances. As the Court has already stated, it is not persuaded that Plaintiffs should be re-

---

appear to be in dispute and the Court finds that the rate is reasonable and fair under the circumstances, that is the rate the Court will apply. *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte,* 141 F.3d 1434, 1447 (11th Cir.1998).

8. Defs.' Mem. in Supp. of Mot. for Dissolution of Prelim. Inj. [28] at 2 ("the City believes the prior plan was constitutional"); Defs.' Mot. for Summ. J. [47] at 3 ("the City's 1996 newsrack plan was a viewpoint neutral and reasonable way to allow newsracks at the Airport while advancing the City's legitimate interest in generating revenue, preserving the Airport's appearance and maintaining Airport safety and convenience"); *see* discussion *infra* **II.D. Extent of Plaintiffs' success.**

quired to pay for newsracks based on gross revenues. Additionally, the Court finds no basis to adjust the back rent payments based on the City's billing practices. The City's billing practices were never an issue in this case nor were they ever part of the injunction imposed by the Court. Furthermore, consideration of these facts do not warrant further adjustment of the rent due.

Finally, Plaintiffs express skepticism regarding the manner in which the City calculated the newsrack rent because the City did not consider gross revenues in its calculation and it made certain assumptions about the number of papers sold in a day, did not distinguish between types of publications and included a component for advertising revenue. Even accepting that the manner in which the City calculated the fee was different from the manner in which it calculates other fees does not make the fee inherently arbitrary or unreasonable. Notably, the publishers are not guaranteed the least expensive method of distribution and the City is free to approve a scheme which results in higher costs for the publishers so long as the scheme is reasonable overall. *AJC III,* 322 F.3d at 1308. Moreover, Plaintiffs have presented no evidence to controvert the Eleventh Circuit's finding that the $20 per newsrack per month fee is reasonable. *Id.* at 1309. Having considered the Plaintiffs' arguments the Court finds that they do not warrant the adjustment of the fee.

Plaintiff USA Today contends that the back rent should be further reduced because USA Today's newsracks were in poor locations, USA Today does not publish every day, the lawsuit involved constitutionally-protected conduct and the award of prejudgment interest should be reduced or denied because of the City's litigious conduct. As for the poor locations and the fact that USA Today does not publish every day, the Court declines to adjust the fee based on these factors. First, USA Today chose the locations of its newsracks and could have removed them if the locations they chose were not profitable. Additionally, the fact that USA Today does not publish every day of the week does not change the fact that the newsrack takes up valuable commercial space in the airport every day of the week, for which the City is entitled to charge rent. As the Court stated above, that fact that the lawsuit involved constitutionally-protected conduct or the fact of the length of the litigation does not overcome the fact of primary importance to the restitution analysis, which is that publishers maintained newsracks in the airport free of charge. The publishers sought the injunction which prevented the City from collecting the $20 fee, a fee found to be reasonable by the Eleventh Circuit Court of Appeals. *AJC III,* 322 F.3d at 1309. While Plaintiffs contend that they have presented evidence to the Court which was not before the Court of Appeals when it made its determination as to the reasonableness of the fee, the Court finds that none of Plaintiffs' arguments undermine the Court of Appeals' conclusion that the fee is reasonable.

In sum, the Court finds that the City is entitled to restitution. The amount of back rent to which the City is entitled is $15 per newsrack per month. Additionally, the City is entitled to simple interest calculated at the rate of seven percent per annum. Accordingly, the City is entitled to restitution from Plaintiff AJC in the amount of $240,072.60; Plaintiff New York Times in the amount of $18,771.60; and Plaintiff USA Today in the amount of $90,801.39. These amounts include rental payments through November 30, 2004.

## II. Attorneys' Fees

The Court now turns to the issue of Plaintiffs' petitions for attorneys' fees.

Plaintiff AJC seeks attorneys' fee in the amount of $799,639.52 and expenses of $48,470.24. Plaintiff New York Times seeks attorneys' fees in the amount of $19,522.00 and expenses of $728.34. Plaintiff USA Today seeks attorneys' fees and expenses in the amount of $823,554.18.[9] Plaintiffs assert that they achieved "excellent" results, and are therefore entitled to a complete award for fees and expenses. By contrast, the City argues that Plaintiffs are entitled to a fraction of this amount and asserts that Plaintiffs' fee awards should be limited to the fees incurred in procuring the preliminary injunction in July 1996. This would result in a fee award to the AJC in the amount of $78,731.00 and USA Today in the amount of $27,532.12.[10] The City's primary objection to Plaintiffs' fee petitions is that Plaintiffs only achieved limited success and consequently the fee petitions should be limited accordingly.

Section 1988 provides for the award of attorneys' fees to the prevailing party in an action brought pursuant to 42 U.S.C. § 1983. 42 U.S.C. § 1988(b); *see Solomon v. City of Gainesville,* 796 F.2d 1464, 1466 (11th Cir.1986) (recognizing that § 1988 was intended to apply in any action for which § 1983 provides a remedy). "A plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

▮▮▮ Once a plaintiff has met this initial threshold, the district court must then determine if the fee claimed is reasonable. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In calculating the amount of a reasonable fee the most useful starting point is the lodestar calculation, the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Id.* The court may further adjust the fee upward or downward based on the "results obtained." *Id.* at 434, 103 S.Ct. 1933 (citing factors identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)). Where a plaintiff has prevailed on some but not all of his claims for relief the court should consider whether the claims are (1) "distinctly different claims for relief that are based on different facts and legal theories," *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933; or, rather (2) claims that "involve a common core of facts" or claims which are based on related legal theories. *Id.* at 435, 103 S.Ct. 1933. If they are distinctly different claims, then the plaintiff may not receive a fee award for services on the unsuccessful claims. *Id.* If, however, the case involved a common core of facts or the claims are based on related legal theories, then the court should focus on the "significance of overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* The extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorneys' fees under § 1988. *Id.* at 440, 103 S.Ct. 1933.

Where a plaintiff has obtained "excellent results," the attorney is entitled to recover a full compensatory fee. *Id.* On the other hand, if a plaintiff has achieved only partial

---

9. The Court has included Plaintiffs' supplemental requests for fees which have been submitted to the Court. *See Villano v. City of Boynton Beach,* 254 F.3d 1302, 1309 (11th Cir.2001) (post-judgment advocacy may generally be included in a § 1988 award).

10. Under the City's argument Plaintiff New York Times would not be entitled to a fee award because it did not incur any fees or expenses until after July 1996.

or limited success, the lodestar calculation may be excessive. *Id.* at 436, 103 S.Ct. 1933. There is no precise formula for making these determinations and the court may choose to identify specific hours that should be eliminated or may simply reduce the award to account for limited success. *Id.* 436–37, 103 S.Ct. 1933. The court has discretion in making this equitable judgment. *Id.* at 437, 103 S.Ct. 1933.

■■■■ A court may consider various factors in determining the reasonableness of attorneys' fees. For instance, because plaintiff's counsel is required to explore every aspect of the case and develop all evidence, the court will expansively treat claims as related. *Popham v. City of Kennesaw,* 820 F.2d 1570, 1579 (11th Cir.1987). Additionally, although the court may not reduce the lodestar based on a simple mathematical approach comparing the total number of issues in the case with those actually prevailed upon, this is a factor that may be considered in evaluating the degree of the plaintiff's success. *Id.* The court may also compare the amount of damages sought with the amount of damages awarded in determining the degree of plaintiff's success. *Id.* at 1580. The court must not place undue emphasis on money damages, however, because successful civil rights actions also vindicate a public interest. *Villano v. City of Boynton Beach,* 254 F.3d 1302, 1306 (11th Cir.2001). Where the plaintiff's relief engenders specific spillover benefits for non-parties, the public benefit may assume a principal significance in the court's calculus. *Popham,* 820 F.2d at 1580.

## A. Prevailing parties

■■■ First, the Court finds that Plaintiffs are prevailing parties for the purposes of § 1988. On this point the parties are in agreement. It is evident that Plaintiffs have achieved some of the benefit they sought in bringing suit. *See Farrar,* 113 S.Ct. at 572; *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. There is no dispute that the judgment affects the behavior of Defendants toward Plaintiffs and that this resolution has changed the legal relationship among the parties. *Farrar,* 113 S.Ct. at 573. In July 1996, Plaintiffs obtained a preliminary injunction against Defendants. *See AJC IV,* 6 F.Supp.2d at 1367 (noting that an award of attorneys' fees under § 1988 does not require a favorable judgment following a full trial on the merits). Additionally, the Court has entered a permanent injunction which enjoins Defendants from taking certain action in the implementation of newsrack plans at the airport. Specifically, Defendants are required to refrain from adopting a newsrack plan which forces publishers to use newsracks bearing advertisements for other products. *AJC I,* 107 F.Supp.2d at 1384. Defendants must also restrain officials' discretion in selecting publications, terminating publications and setting a reasonable fee for publications in newsracks at the airport. *AJC III,* 322 F.3d at 1312.

## B. Lodestar calculation

Having determined that Plaintiffs are prevailing parties the Court begins by examining the lodestar calculation. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933 (the lodestar calculation is the most useful starting point for determining the amount of a reasonable fee). The Court has carefully reviewed the hours submitted and fees requested by Plaintiffs and finds that they are reasonable. Moreover, Defendants "do not dispute that plaintiffs incurred the attorney's fees sought in their motions ... and does not take issue with the hourly rates of plaintiffs' attorneys." (Defs.' Resp. to Pls.' Mots. for Attorney's Fees and Expenses [182] at 1.) Nor have Defendants interposed any specific objec-

tions to the number of hours or hourly rates. *See Lambert v. Fulton County, Georgia,* 151 F.Supp.2d 1364, 1369 (N.D.Ga.2000) (objections and proof concerning hours to be excluded must be specific and reasonably precise). Therefore, having reviewed the hours and rates submitted, and since Defendants have not objected to them, the Court finds that the hours and rates submitted are reasonable.

## C. Relationship of the claims

Having determined that Plaintiffs are prevailing parties, and that the lodestar calculations are reasonable, the Court turns to the question of the relationship of the claims. This is necessary since Plaintiffs have prevailed on some, but not all of their claims. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. If the claims are distinctly different it would not be appropriate to award Plaintiffs any fees on the unsuccessful claims. *Id.* at 435, 103 S.Ct. 1933. However, if the claims arose from a common core of facts then the Court must focus on the overall relief obtained by Plaintiffs in relation to the hours expended. *Id.*

The Court finds that Plaintiffs claims all arise from a common core of facts. All of Plaintiffs' claims challenge the 1996 Plan and the City's ability to regulate the distribution of newspapers through newsracks. All of the claims, both successful and unsuccessful, are factually and legally intertwined such that it would be difficult to separate them out into discrete individual claims. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (stating that much of counsel's time will be devoted generally to the litigation as a whole); *Popham,* 820 F.2d at 1579 (claims arising out of the same course of conduct share a common core of fact and are related for purposes of § 1988). For example, the Eleventh Circuit Court of Appeals vacated the portion of the

Court's injunction which prohibited the imposition of a profit-conscious fee. *AJC III,* 322 F.3d at 1312. At the same time, however, the Eleventh Circuit noted that the discretion surrounding the fee must be restrained through procedures designed to reduce or eliminate the possibility of viewpoint discrimination and retained that portion of the injunction. *Id.* Plaintiffs' claims all arose out of their challenge to the 1996 Plan and are related for purposes of § 1988.

Since the Court has found that Plaintiffs' claims arose out of a common core of facts, in order to determine the appropriate fee award the Court must focus on the significance of overall relief obtained by the Plaintiff. *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933. The Court will review the lodestar calculations presented by Plaintiffs to account for limited success. *Id.* at 436–37, 103 S.Ct. 1933 (the court may identify specific hours or may reduce the award to account for limited success). Therefore, Defendants contention that Plaintiffs did not separate out their time entries based on successful and unsuccessful claims is inapposite. For example, Defendants assert that Plaintiffs prevailed on the issues of advertising and unbridled discretion but that Defendants prevailed on the issue of the profit-conscious fee. While this may have been relevant if the Court had found that the claims were distinct and different, having found that they arose from a common core of facts requires the Court to consider Plaintiffs' overall success in the litigation as a whole.

## D. Extent of Plaintiffs' success

The Court's determination of the proper amount of attorneys' fees will turn on the extent of Plaintiffs' success in this lawsuit. This is a point of great contention among the parties. On the one hand, Plaintiffs contend that they have achieved "excel-

lent" results and are entitled to their entire attorneys' fees. On the other hand, Defendants assert that they won the main issue in the case which was the ability of the City to impose a profit-conscious fee. Defendants argue that since the issuance of the preliminary injunction in July 1996, Plaintiffs have only prevailed on the two issues that Defendants sought to abandon.

There is no doubt that Plaintiffs achieved significant relief in this litigation. Plaintiffs succeeded in obtaining preliminary injunctive relief and in having the Eleventh Circuit Court of Appeals affirm two prongs of the three-pronged permanent injunction. Today, as a result of Plaintiffs' efforts, Defendants must alter their conduct to conform to the Orders of the Court when considering the implementation of newsrack plans for the regulation of newspapers in newsracks at the airport. Specifically, Defendants must comply with the remaining two prongs of the permanent injunction and with the mandate of the Eleventh Circuit.

Of particular importance to the Court's consideration of the success of Plaintiffs' lawsuit is the public benefit conferred. "The affirmation of constitutional principles produces an undoubted public benefit that courts must consider in awarding attorneys' fees under Section 1988." *Popham*, 820 F.2d at 1580; *see City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (damage awards do not reflect fully the public benefit advanced by civil rights litigation because Congress did not intend for fees in civil rights cases to depend on obtaining substantial monetary relief). In *Villano v. City of Boynton Beach*, 254 F.3d 1302 (11th Cir.2001), the Eleventh Circuit Court of Appeals held that the district court erred in reducing the fee award where the Court failed to consider the public benefit, which is an important measure of success.

*Id.* at 1307. In *Villano*, the district court failed to determine whether the results were "excellent" and failed to consider the qualitative value of the fact that the plaintiff in that case recovered not only against an individual police officer but also against the municipal defendant. *Id.But see Popham*, 820 F.2d at 1581 (finding no abuse of discretion where district court reduced fee by two-thirds where lawsuit did not result in specific identifiable benefits to non-parties, did not challenge institutional conduct and plaintiff did not recover against municipal defendant). Vindicating a constitutional right against a municipal defendant heightens the public benefit created by the lawsuit. *Villano*, 254 F.3d at 1306.

In this case, the Court finds that Plaintiffs' actions have conferred a substantial public benefit. First of all, relief granted to Plaintiffs engenders specific spill-over benefits to non-parties against a municipal defendant. *Popham*, 820 F.2d at 1580. Any constitutional plan adopted by the City will be applicable not only to Plaintiffs but to any publisher that wishes to distribute newspapers through newsracks at the airport. Defendants contend that because Plaintiffs had alternative means of distributing newspapers at the airport through newsstands, the public would have had access to their newspapers anyway and so they accomplished little through the litigation. This position, however, only underscores the importance of the public benefit conferred by Plaintiffs' litigation for the benefit of non-parties. This is particularly significant for publishers who may not have the economic ability to demand inclusion at newsstands or to bring a suit to challenge the newsrack policy. *See Rivera*, 477 U.S. at 575, 106 S.Ct. 2686 ("If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen suf-

fers.") (quoting 122 Cong. Rec. 33,313 (1976) (remarks of Sen. Tunney)).

Any publisher may now benefit from the procedural protections, limitations and restraints on official discretion that are required under the permanent injunction entered by the Court and upheld by the Eleventh Circuit Court of Appeals. Plaintiffs have succeeded in securing these vital first amendment guarantees not only for themselves but also for the public in general. *Villano*, 254 F.3d at 1308 (the court needs to account for the vital role of private litigation in the enforcement of civil rights, the difficulties in sustaining those lawsuits, the heightened importance of lawsuits when the defendant is a public body and when those lawsuits ultimately vindicate a constitutional right).

Even though there has been a significant public benefit conferred, Plaintiffs' success falls just short of being an "excellent" result in the context of the litigation as a whole. The fee inquiry does not end with a finding that the plaintiff obtained significant relief. *Hensley*, 461 U.S. at 440, 103 S.Ct. 1933. A reduced fee is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole. *Id.* Defendants prevailed on an important issue in the litigation as well the ability to charge a profit-conscious fee for use of newsracks at the airport. The Eleventh Circuit held that the airport's interest as a proprietor justified its imposition of a profit-conscious fee. *AJC III*, 322 F.3d at 1307 n. 10. The Eleventh Circuit went on to find the $20 per month per newsrack fee to be facially reasonable. *Id.* at 1309. Therefore, the Court finds that Plaintiffs' success is more appropriately described as "limited." Based on Plaintiffs' limited success the Court finds that Plaintiffs are not entitled to the entirety of the fees they have requested. Since Defendants succeeded on the profit-conscious fee issue, a fee award to Plaintiffs for their entire attorneys' fees would be excessive.

With regard to the amount of fees, Defendants argue that the Court should slash Plaintiffs' attorneys' fees and contend that the only issue that they ever really opposed was the profit-conscious fee. Defendants contend that the Court should have permitted the City to adopt the 1997 Plan, and that if that had been approved, the parties would have been in the same position then as they find themselves in today. The Court agrees that Plaintiffs' success has been limited, but Defendants' assertions that the parties find themselves in the same position today as they would have been in 1997 are astounding in light of the history of this litigation and positions taken by the City during the past eight years. The Court is perplexed by Defendants' current attempts to recharacterize their actions. Despite years of stubborn and contentious litigation Defendants contend that Plaintiffs prevailed only on issues that Defendants "sought to abandon," but inexplicably never did. Defendants cannot contest that for eight years, the City has claimed that the 1996 newsrack plan was constitutional.[11] Although

11. *See AJC III*, 322 F.3d at 1304 n. 7 (adopting the prior panel opinion on the constitutionality of the advertising on the newsracks); *AJC II*, 277 F.3d at 1326 n. 1 ("The City has never officially withdrawn any aspect of the 1996 plan, never represented that it has abandoned this aspect of the plan, nor conceded that it unconstitutionally compelled speech. The City may not 'moot' an issue by making promises in legal briefs that it has ceased the activity in question, particularly when it continues to maintain the restriction is constitutional."); Defs.' Mem. in Supp. of Mot. for Dissolution of Prelim. Inj. [28] at 2 ("the City believes the prior plan was constitutional"); Defs.' Mot. for Summ. J. [47] at 3("the City's 1996 newsrack plan was a viewpoint neutral and reasonable way to allow newsracks at the

they now point to this Courts' statements in 1998 that the City had abandoned the plan, the City's subsequent appeal of that Order makes more than clear that the City, even if it had agreed to do so at some point, never actually did. Rather than recount in detail the entire procedural history of this case, the Court will address Defendants' individual arguments to determine the appropriate attorney fee reduction to account for Plaintiffs' limited success.

### 1. Defendants' argument that it should have been allowed to implement the 1997 newsrack plan

Defendants contend that if the Court had permitted it to implement the 1997 Plan, then the parties would have been in the same position in which they find themselves today. Defendants' assumption lacks merit. First of all, the Court never *prevented* the City from implementing the 1997 newsrack plan. Nothing prevented the City, in 1997 or at any time since then, from implementing a constitutional newsrack plan that complied with the Orders of this Court. The preliminary injunction issued in July 1996 enjoined the City from enacting the 1996 newsrack leasing program. The permanent injunction issued in 2000 enjoined the City from enacting "any newsrack plan at Hartsfield Atlanta International Airport which features any [prohibited] characteristics." *AJC I*, 107 F.Supp.2d at 1384. Moreover, the Court's Order in 1998 never prohibited the City from enacting the 1997 newsrack plan. The Court held only that "the propriety of the proposed plan is not fit for judicial review" and declined to consider it in determining if the preliminary injunction should be dissolved. *Id.* at 1364–65. Defendants maintained the constitutionality

of the 1996 Plan (*see* Mem. in Supp. of Mot. for Dissolution of Prelim. Inj. [28]) and the Court held that "Defendants' conduct subsequent to entry of the Court's original order suggests that dissolution would be adverse to the public's interest in the preservation of free speech." *Id.* at 1366. Therefore, the Court has never *prevented* the City from adopting the 1997 plan, or any other plan, so long as it did not violate the injunction.

Second, the Court cannot agree with the City that the 1997 plan was identical to the 2003 plan in all material respects. Specifically, the 2003 plan which was found to be facially constitutional provided limits to officials' discretion in selecting and terminating publications and in setting the fee to be charged. These protections are not present in the 1997 plan.

Finally, the City's statement that the parties would have been in the same position in 1997 as they are today if the Court had permitted the adoption of the 1997 Plan is incredulous. In the posture in which the 1997 Plan came before the Court, if the Court had "approved" the 1997 Plan and dissolved the preliminary injunction, there would exist none of the protections against unbridled discretion guaranteed to publishers and the public under the current permanent injunction.

### 2. Defendants prevailed on the only issue about which it would not compromise

Defendants argue that the main issue in this case was the profit-conscious fee. Defendants argue that they were willing to compromise on all other issues in the case as early as 1997, and therefore, Plaintiffs should not be able to recover attorneys' fees after that date. What Defendants fail

---

Airport while advancing the City's legitimate interest in generating revenue, preserving the

Airport's appearance and maintaining Airport safety and convenience").

to recognize is that although they now assert that they were willing to compromise as to these issues, they never did. Defendants' representations to this Court on summary judgment, and as evidenced by the opinions by the Court of Appeals on appeal and before the en banc Court make clear that Defendants continued to litigate the issues which they now claim they were willing to concede.

■ The ability of the City to charge a profit-conscious fee to publishers is no insignificant victory. As such, to award Plaintiffs their entire attorneys' fees in litigating this case would be excessive. The Court finds, however, that the City is entitled to a reduction of no more than twenty percent, because it was the City's stubborn litigiousness, and steadfast adherence to the 1996 Plan which prolonged the litigation. For instance, Plaintiff USA Today contends that it had reached a settlement agreement with the City. If a settlement had been reached with USA Today, this would have substantially reduced the amount of attorneys' fees now claimed by Plaintiffs. The City's only response has been that no agreement was reached because the City would only agree to settle if the settlement involved all Plaintiffs. This is a decision which the City was certainly entitled to make. The City cannot state, however, that it was willing to compromise, refuse such a compromise, and now complain about the mounting fees because there was no compromise. *Rivera,* 477 U.S. at 580 n. 11,

106 S.Ct. 2686; *see Copeland v. Marshall,* 641 F.2d 880, 904 (C.A.D.C.1980) ("The government's contentious litigation strategy forced the plaintiff to respond in kind. The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.").

This Court is intimately aware of and mindful of positions taken by the parties, and the representations made to the Court during the history of this litigation. Defendants refused to concede the unconstitutionality of any part of the 1996 Plan and attempted to "moot" the issue by replacing it with the 1997 Plan while still maintaining the constitutionality of the 1996 Plan. The Court cannot speculate as to Defendants' litigation strategy because it has never been clear to the Court. As the Court has stated, *why* Defendants continued to maintain the constitutionality of a facially unconstitutional newsrack plan rather than abandoning and starting over is beyond this Court's comprehension. What is clear is that Defendants never abandoned the 1996 Plan. Defendants maintained its constitutionality, and at summary judgment argued that the *entire* plan was viewpoint neutral and reasonable. If Defendants had wished only to challenge the profit-conscious fee issue before this Court and on appeal, it could have done so, and in so doing, narrowed the scope and perhaps the duration of the litigation.[12] Defendants chose to pursue a broader litigation strategy and cannot now

12. Plaintiffs' challenge to the profit-conscious fee, though ultimately unsuccessful, was at least based in the law of this circuit. A panel of the Eleventh Circuit Court of Appeals initially affirmed the entire injunction noting that it was foreclosed from reconsidering the decision in *Sentinel Communications Co. v. Watts,* 936 F.2d 1189 (11th Cir.1991). *See AJC II,* 277 F.3d at 1329 ("Were we writing on a clean slate we might well be persuaded of the merits of the governmental versus pro-

prietary distinction advanced by the Department [but] .... [o]nly this court sitting *en banc,* can reconsider this holding"). Subsequently, the *en banc* court did just that. *AJC III,* 322 F.3d at 1312 (holding that when government acts in a proprietary capacity then profit-conscious contracts may be negotiated for use of space in a non-public forum for First Amendment activities). By contrast, Defendants continuously maintained the constitutionality of the *entire* plan, including air-

be heard to complain about the entirely foreseeable consequences of their actions.

As prevailing parties, the Court finds that Plaintiffs are entitled to recover eighty percent of the attorneys' fees and costs requested. The Court has reduced the total amount by twenty percent based on Plaintiffs' limited success and Defendants' success in being permitted to charge a profit-conscious fee. The Court has not given Defendants a greater reduction because Plaintiffs' actions have conferred a significant public benefit, that spills over to non-parties to the litigation. Moreover, the Court finds that it would be inequitable to give Defendants a greater reduction because Defendants' actions in maintaining the constitutionality of the entire 1996 newsrack plan were largely responsible for the long duration of the litigation and mounting attorneys' fees. AJC is entitled to recover attorneys' fees and costs in the amount of $678,487.80. The New York Times is entitled to recover $16,200.28. USA Today is entitled to recover $659,016.38.

### Conclusion

The Court finds that the City is entitled to restitution. The amount of back rent to which the City is entitled is $15 per newsrack per month. Additionally, the City is entitled to simple interest calculated at the rate of seven percent per annum. The City is entitled to restitution from Plaintiff AJC in the amount of $240,072.60; Plaintiff New York Times in the amount of $18,771.60; and Plaintiff USA Today in the amount of $90,801.39. These amounts include rental payments through November 30, 2004.

The Atlanta Journal and Constitution's Motion for Attorneys' Fees and Ex-

penses [173–1, 141–1], New York Times Company's Motion for Attorneys' Fees and Expenses [174–1, 140–1], USA Today's Second Motion for Attorney's Fees and Expenses as Prevailing Party [177–1, 144–1], and USA Today's Second Application for Attorney's Fees and Expenses [178–1, 145–1] are hereby GRANTED. AJC is entitled to recover attorneys' fees and costs in the amount of $678,487.80. The New York Times is entitled to recover $16,200.28. USA Today is entitled to recover $659,016.38.

---

port officials' unbridled discretion which was clearly unconstitutional. *See AJC III*, 322 F.3d at 1312 ("we retain that portion of the injunction that prohibited the administration of any plan that did not explicitly constrain

official discretion"); *AJC II*, 277 F.3d at 1329 (the guidance offered under the 1996 Plan "not only permits, but in fact compels, the official to discriminate among viewpoints specifically upon the viewpoint itself").